TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
3590 Barrymore Dr.
Reno, NV 89512
(775) 337-0323
keysercooper@lawyer.com

KERRY S. DOYLE
Doyle Law Office, PLLC
Nevada Bar No. 10866
4600 Kietzke Lane, Ste. I-207
Reno, NV 89502
(775) 525-0889
kerry@doylelaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMES COLTRAIN, CAROL FESSER, SUSAN
PATRICIA SCHULTZ, as ADMINISTRATOR
of the ESTATE OF KELLY EILEEN COLTRAIN,

Plaintiffs,                          **COMPLAINT**

v.                                   **JURY DEMAND**

MINERAL COUNTY; SHERIFF RANDY ADAMS;
SERGEANT JIM HOLLAND; RAY GULCYNSKI;
and DOES 1-10,

Defendants.
_____/

## JURISDICTION AND VENUE

1.      This action arises under Title 42 of the United States Code ("U.S.C."), 28 U.S.C. Sections 1983 and 1988. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331, 1343 and 42 U.S.C. Section 12188(a).

2.      Venue is proper in the Northern District of Nevada pursuant to 28 U.S.C. section 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district.

1

**PARTIES**

3.    Kelly Eileen Coltrain ("Kelly," "Kelly Coltrain" or "Ms. Coltrain") died on July 23, 2017. At the time of her death, she had just turned 27 years old.

4.    Plaintiff James Coltrain ("Coltrain") is the father of decedent Kelly Coltrain. Coltrain is a citizen of the United States residing in Sarasota, Florida. Coltrain is a co-beneficiary of the estate of his daughter, decedent Kelly Coltrain.

5.    Plaintiff Carol Ann Fesser ("Fesser") is the mother of decedent Kelly Coltrain. Fesser is a citizen of the United States residing in Taylorville, Illinois. Fesser is a co-beneficiary of the estate of her daughter, decedent Kelly Coltrain.

6.    Plaintiff Susan Patricia Schultz ("Schultz") is the grandmother of decedent Kelly Coltrain and the duly appointed, qualified, and acting Special Administrator of the Estate of Kelly Eileen Coltrain. Schultz is a citizen of the United States residing in the County of Washoe in Nevada. Schultz brings this action in her capacity as Administrator of the Estate and for the benefit Kelly Coltrain's heirs.

7.    Defendant Mineral County is a municipal government entity duly incorporated under the laws of the State of Nevada. Under its authority, Defendant Mineral County operates and manages the MCJ ("the Jail"), and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the MCJ, and its respective employees and/or agents.

8.    Defendant Randy Adams ("Adams") was, at all relevant times, the Sheriff of Mineral County, the highest position in the Mineral County Sheriff's Department. Pursuant to NRS 211.140(1), Adams has charge and control over all prisoners committed to his care in the Mineral County Jail ("MCJ"). Pursuant to NRS 211.140(4) and MCJ procedures, Adams is responsible for arranging for the administration of medical care required by prisoners while in his custody. As Sheriff, Adams is and at all relevant times was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Jail custodial employees and/or agents, medical staff and Doe Defendants. Adams, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

9.     At all times relevant to this complaint, Defendant Randy Adams was the policy-maker for the Mineral County Sheriff's Department and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's Department, who are under his command and/or who report to him, including the Doe Defendants yet to be identified.

10.     The MCJ is owned and operated by County of Mineral and staffed by County of Mineral sheriff's deputies.

11.     Defendant Sergeant Jim Holland ("Holland"), at all times relevant, was employed by the Mineral County Sheriff's Office. Holland, as a supervisor, directed subordinates Deputy Ray Gulcynski and Does 1-10 in the acts that deprived Kelly Coltrain of her particular rights and caused her death. Holland set in motion a series of acts by Does 1-10, or knowingly refused to terminate a series of acts by subordinates Deputy Ray Gulcynski and Does 1-10 that he knew, or reasonably should have known, were objectively unreasonable and would cause the death of Kelly Coltrain. Holland's conduct was so closely related to the deprivation of Kelly Coltrain's rights to be free from deliberate indifference to her serious medical needs as to be the moving force that caused the death of Kelly Coltrain. Holland, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

12.     Defendant Deputy Ray Gulcynski ("Gulcynski"), at all times relevant, was employed by the Mineral County Sheriff's Office. Gulcynski was involved in the acts that deprived Kelly Coltrain of her particular rights and caused her death. Gulcynski denied Ms. Coltrain medical care, refusing to take her to the hospital when he knew she was drug dependent, suffered seizures, and requested medical attention. Gulcynski's conduct was so closely related to the deprivation of Kelly Coltrain's rights to be free from deliberate indifference to her serious medical needs as to be the moving force that caused the death of Kelly Coltrain. Gulcynski, at all relevant times hereto, was acting under color of state law, and is sued in his individual capacity.

13.     Plaintiffs are at the time of the filing of this Complaint, ignorant of the true names and capacities of Defendants Does 1-10 and, therefore sue these Defendants by such fictitious

names. Plaintiffs are informed and believe and thereon allege that Defendants Does 1-10 were employed by the Mineral County Sheriff's Office as deputies at the time of the conduct alleged herein. Plaintiffs allege Defendants Does 1-10 violated Kelly Coltrain's civil rights by their deliberate indifference to her serious medical needs and failed to provide the urgent medical care she required to prevent her death, thereby causing her death, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct. Plaintiffs will seek leave to amend their Complaint to state the names and capacities of Defendants Does 1-10, when they are identified and ascertained. Does 1-10, at all relevant times hereto, were acting under color of state law, and are sued in their individual capacity.

14.     Plaintiffs allege that the conduct of each Defendant deprived Kelly Coltrain of her constitutional right to adequate medical care for her serious but treatable medical needs and ultimately caused her death.

15.     Each of the Defendants caused, and is responsible for, the unlawful conduct directed towards Kelly Coltrain. Each of the Defendants by participating in the unlawful conduct, or acting jointly and in concert with others who did, authorized, acquiesced, condoned, and approved the unconstitutional conduct by failing to take action to prevent the unconstitutional conduct—which resulted in the death of Kelly Coltrain.

16.     Wherever reference is made in this Complaint to any act by Defendants, it is alleged that each Defendant was the agent of the others, each Defendant was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them shall also be deemed to mean the acts and failures to act of each Defendant individually, jointly or severally.

**FACTUAL ALLEGATIONS**
**Correctional Professionals' Knowledge**
**Of The Serious Risks Of Heroin Detoxification**

17.     The MCJ houses pretrial detainees and persons convicted of crimes. Mineral County is obligated by state and federal law to provide medical care for persons lodged in the MCJ.

18.     In the years and months before Kelly Coltrain's July 19, 2017 admission to the MCJ, the abuse of heroin and other opiate-based controlled substances increased dramatically throughout the nation and, in particular, in Mineral County and the surrounding areas.

4

19.    During that time period, patterns of heroin and opiate abuse showed significant increases among young women of the same demographic background as Kelly Coltrain.

20.    Reasonably trained correctional policymakers and officers were aware of these patterns of increased abuse of heroin and other opiate-based controlled substances.

21.    Reasonably trained correctional policymakers and officers were particularly attuned to patterns of heroin and opiate abuse due to the disproportionately high number of heroin and opiate abusers typically present in a correctional population.

22.    Reasonably trained correctional policymakers and officers were aware of the significant medical issues presented in heroin users detoxifying from heroin due to sudden termination of their usage upon admission to the correctional facility.

23.    Reasonably trained correctional policymakers and officers were, likewise, aware of the risk of seizures associated with detoxifying from heroin and that seizures from detoxification can and do cause death.

24.    Detoxification is known to have several harmful and potentially fatal medical consequences, and, as such, inmates experiencing heroin detoxification have serious medical needs.

25.    Such dangerous and serious medical consequences are particularly likely to be present in persons who have a history of having seizures in conjunction with prior histories of withdrawal.

26.    For these reasons, basic recognized standards of correctional healthcare require that persons who are admitted to correctional facilities with a known history of heroin or other opiate abuse and a history of seizures in conjunction with withdrawal be medically monitored.

27.    Such monitoring must include assessments multiple times per day of vital signs, including pulse, respirations, blood pressure and body temperature as well as cell checks to monitor the health and safety of such individuals.

28.    Such monitoring must also include evaluation multiple times per day of symptoms which are consistent with serious health consequences of detoxification, such as seizures, vomiting, diarrhea, anxiety, sweating, and restlessness.

29.     Monitoring, assessment and evaluation of this nature is necessary to ensure that an inmate experiencing heroin detoxification is not at risk for more serious medical consequences including those outlined above.

30.     Defendant Mineral County, as an entity that operates the MCJ, is charged with the responsibility to provide medical care to an inmate population, was aware of the medical issues presented in an inmate population and was thus aware of the need for monitoring assessment and evaluation of persons admitted to correctional facilities with histories of heroin, other opiates, and seizures related to withdrawal.

31.     Defendant Mineral County was aware of the need to establish and follow specific policies, practices and guidelines for its employees and health care professionals regarding care for inmates with histories of heroin or other opiate abuse and histories of seizures related to withdrawal.

32.     Defendant Mineral County was, likewise, aware of the need to supervise, train, and discipline its contractors and/or employees concerning compliance with established policies, practices and guidelines, including those policies, practices and guidelines regarding care for inmates with medical histories of heroin or other opiate abuse and histories of seizures related to withdrawal.

**MCJ Medical Policies**

33.     Mineral County Sheriff's Policy 4.000 (I)(B)(1)(e) mandates that inmates with a history of seizures will be transported for medical clearance prior to admittance into the MCJ.

34.     Mineral County Sheriff's Policy 4.070 (II)(A) designates "Max Cells" for inmates at risk because of drug use. The policy requires that such inmates "be placed on a minimum of a 15-30 minute watch with a physical check to be completed twice hourly if the subject is lying down." The deputy initiating the placement of the inmate into the security cell also must "initiate an incident report and protective custody watch sheet," which "will include circumstances surrounding the security cell placement, notification, actions and or observations taken."

35.     Mineral County Sheriff's Policy 4.145(A) designates a sergeant to act as a "Medical Liaison Deputy" to schedule appointments, maintain medical records, and fill and re-fill medication.

6

36.     Mineral County Sheriff's Policy 4.145(B) designates the "Medical Authority" for the MCJ as the Mt. Grant General Hospital, across the street from the jail. The clinic is located between the hospital and the fire department.

37.     The MCJ does not have a nurse, a doctor, or any trained medical staff on premises.

38.     Mineral County Sheriff's Policy 4.145(I)(A) mandates the hospital will be called anytime an inmate requests transport to the emergency room for non-life threatening conditions. A deputy will give a doctor the signs and symptoms as described by the inmate. The doctor will make a decision on whether the inmate needs to be transported to the hospital for treatment based on the deputy's "description" of the inmate's signs and symptoms. The policy makes no provision for the inmate to speak with or be evaluated by a medical professional.

39.     Mineral County Sheriff's Policy 4.145(II)(A) mandates any inmate requesting to see the hospital will fill out an inmate request form with a description of the illness and symptoms.

40.     Mineral County Sheriff's Policy 4.145(VII)(A) mandates the Medical Liaison Deputy start a medical file on all inmates requesting to go to the hospital. Each file will contain the request for medical attention and various medical and booking information.

41.     The MCJ does not have a nurse, nurse's assistant, physician, physician's assistant or any medically trained or licensed medical professional on duty at the jail at any time. There is no designated doctor for jail inmates. All medical assessments, evaluations, and appraisals are done by deputies who have no medical training.

42.     The MCJ does not have written medical protocols on drug withdrawal in inmates, including what to do with such inmates, what signs and symptoms are to be observed, and what symptoms and behavior may represent a serious and life-threatening condition.

43.     The MCJ does not monitor, assess, or evaluate inmates detoxifying from drug dependency at the Jail. MCJ deputies do not monitor inmates detoxifying from drug dependence and do not assess vital signs of such individuals.

44.     The MCJ does not monitor the symptoms consistent with serious health consequences of detoxification, such as seizures, vomiting, diarrhea, anxiety, sweating, and restlessness. No records or notations are kept by jail deputies of these symptoms.

**Kelly Coltrain's Background and Admission to the MCJ**

45.     Throughout her childhood, Kelly Coltrain was a successful student, a friendly outgoing girl, and an exceptionally talented soccer player. Kelly was unusually close to her family. She enjoyed talking with and spending time with both parents, her sister and brother, and living with them on occasion as she traveled. Kelly was also unusually close with her grandmother and her extended family, cousins, aunts, and uncles. Kelly was a vegetarian who loved yoga and arts and crafts. Her ambition was to become a nurse and, at the time of her death, she was a massage therapist with plans to enroll in a college nursing program. Kelly had a life of promise and potential.

46.     In her teens, Kelly suffered a severe tear in her knee and a resulting surgery. The surgery ended her athletic career. As a result, she became depressed, confused, and disheartened. During this unhappy period, she met students using drugs and began experimenting. Soon she became drug dependent.

47.     In 2008, Kelly graduated from high school. Kelly was using drugs but also trying to stop using drugs. She enrolled in several drug rehabilitation programs, counseling programs, and therapy sessions in unsuccessful efforts to stop her drug use. She was discouraged at the physical difficulty in remaining drug free, but she was still a happy, hopeful, confident young woman.

48.     Despite drug dependence, Kelly was employed most of her life—for a time she managed a bowling alley and at another time she managed a small hotel—she paid her bills and was a responsible young woman.

49.     On July 17, 2017, Kelly was living in Austin, Texas, but traveled to Nevada to participate in a family celebration honoring her grandmother's 75th birthday. She was upbeat, cheerful, and optimistic. She gave family members massages and participated in a family talent show, happily discussing with her large family her future career plans and desire to return to school.

50.     On July 19, 2017, Kelly was stopped for speeding outside of Hawthorne, Nevada. A routine wants and warrants check revealed her Nevada driver's license was suspended due to a failure to appear for prior traffic violations. Kelly was taken to the MCJ in Hawthorne.

51.     Shortly after arrival at the MCJ and during her initial intake, Kelly reported to Defendant Holland that she was drug dependent with a history of seizures related to drug withdrawal. Kelly told Holland she would need to go to the hospital and required medical care.

52.     Holland did not advise medical staff at the hospital of Kelly's drug dependence or her desire to go to the hospital.

53.     Holland did not designate in any way that Ms. Coltrain was to receive medical monitoring or attention.

54.     Holland did not fill out a medical request form.

55.     Holland did not inform MCJ deputies of the need to assess Kelly's vital signs or symptoms as she detoxified.

56.     Holland ignored Kelly's need for medical care and assessment.

57.     At intake, Kelly was not seen by a nurse, a nurse practitioner, a physician, a physician's assistant, or any trained medical person. No medical staff examined Ms. Coltrain or was made aware of her request or need for medical attention. Her vitals were not taken, her pulse was not recorded, her blood pressure was not monitored, and her oxygen saturation not noted.

58.     At no time during Kelly's stay at the MCJ, was she ever seen by any medical personnel or medically monitored in any way.

59.     Given Kelly's drug dependence, imminent withdrawal, and history of seizures, defendants and all MCJ deputies should immediately have contacted a medical provider and began monitoring her condition. The initiation of a drug withdrawal protocol, such as the Clinical Opiate Withdrawal Scale ("COWS") before Kelly began exhibiting withdrawal symptoms would have decreased the severity of her withdrawal symptoms and would have prevented her seizure-related death.

60.     Kelly was put in a single observation cell, designated a "Max Cell" at the MCJ, equipped with video camera 24 hours per day. The video was monitored by deputies in the jail's "bubble," but not by trained medical personnel.

61.     According to policy, Kelly should have been monitored at a minimum of 15-30 minute intervals. Because Kelly was "lying down" a "physical check" of her condition was to be completed twice hourly.

62.     The video recording of Kelly's incarceration reveals that Kelly was lying down the vast majority of the time she spent at MCJ, yet she was not physically checked twice hourly pursuant to policy.

**The MCJ Video and Conversations Between Carol Fesser and Holland**

63.     The video on July 19th at or about 1100 shows Kelly speaking to Holland and entering her cell. At approximately 1213, Kelly was given a sandwich and ate the sandwich. After eating, she lied down, pulled her arms inside her t-shirt, got into a fetal position, and alternatively slept and sat on the bed in a variety of positions.

64.     The video on July 19th at or about 1256 shows Kelly leaving her cell for approximately one hour and returning with a green blanket. It is believed that during that period Ms. Coltrain placed a telephone call to her mother.[1]

65.     The video on July 19th at or about 1340 shows Ms. Coltrain returning to her cell, taking off her shoes, and lying down in a fetal position covered by the blanket. A deputy walked by her cell but did not enter. At some point before 1400, Kelly left her cell briefly and returned wearing stripped jail pants and jail shirt, and carrying a container with another blanket and sheets.

66.     The video on July 19th from about 1400 until 1800 shows Ms. Coltrain in bed, restless, covered from top to toe in blankets, with no part of her body visible. People were observed walking by her cell; none stopped at her cell or entered.

67.     At approximately 1727, Holland placed a food tray on Ms. Coltrain's cell door food slot.

68.     At approximately 1800, Ms. Coltrain used the toilet, returned to bed, and again covered herself completely under the blankets.

---

[1] The call was recorded. Ms. Coltrain explained to her mother, Carol Fesser, that she was arrested for speeding with bail set at $1,750.00. Ms. Coltrain implored her mother not to bail her out. Both mother and daughter expressed love for each other.

69.     At approximately 1836, Kelly appeared to have some sort of brief episode with convulsive type movements for about ten seconds and then went to sleep.

70.     At about 1900 someone walked by Ms. Coltrain's cell but did not stop.

71.     At about 1950, Ms. Coltrain reached over to push a small intercom box on the wall. Four minutes later Defendant Gulcynski appeared at the bars and spoke to Kelly in a conversation which lasted slightly over one minute. Kelly reclined in the bed during this conversation.

72.     While the recording does not provide audio, Gulcynski later reported that Ms. Coltrain told him she needed to go to the hospital right away. Gulcynski told Ms. Coltrain that he was "Not going to take her to the hospital . . . that's not the way detention works. You are incarcerated with us so . . . you don't get to go to the hospital when you want, when we feel that your life is at risk . . . then you will go."

73.     He stated his disbelief that Coltrain could be suffering withdrawal symptoms based on his perception that she had only been in custody for four hours. Gulcynski stated he told Ms. Coltrain he would take her to the hospital if her withdrawal symptoms worsened overnight.

74.     Gulcynski admitted that Coltrain told him, as she had told Holland, that she suffered seizures. Gulcynski replied: "The next time you have a seizure, since you're prone to them, hit the button, and I'll come in here right away."

75.     Gulcynski did not have Kelly complete a medical request form, he did not contact the medical authority, he did not have Kelly evaluated by a medical professional, and he did not provide Kelly with any medical care.

76.     The video on July 19th from 2040 to 2340 shows Kelly in bed, restlessly moving about under the blankets—occasionally yawning, stretching, and shifting positions—remaining buried under the blankets from top to toe, in a fetal position. A deputy walked past her cell but did not stop. At approximately 2147, Kelly sat up in bed and leaned over to push the intercom box. A deputy arrived and another brief conversation occurred. After ten seconds the deputy disappears, Kelly put her blanket over her and remained prone for hours.

77.     The July 19th video reveals that no medical person came to see Ms. Coltrain and her vitals were not taken. She is not visited by medical personnel and there are no documents showing incidents, observations, medical care, or medical monitoring.

78.     The July 20th video from 0000 to 0100 shows Ms. Coltrain lying in bed mostly covered by blankets. At approximately 0115, Gulcynski opened her cell door and stood at the entrance for a few moments looking at Coltrain. It appeared he was saying something to her but she did not respond. Gulcynski entered the cell and kicked her bed. Kelly got up, walked out of her cell, and returned approximately four minutes later. She put a blanket over her head and went to bed.

79.     The July 20th video from 0120 to 0940, shows Kelly lying hour after hour in bed, completely covered with blankets, at times restless, but primarily lying in a fetal position. At approximately 0713, Holland is outside her cell door. He appears to be holding a plate or bowl. It is unknown if Holland spoke to Ms. Coltrain, it doesn't appear that she responded. One minute later, Holland exits out of camera view. Holland returned a few seconds later and looked at Kelly for a brief moment as she lay buried under blankets. At 0940, Kelly sat up, pushed her jail container under her bed, and used the toilet. At 0951, Holland is observed standing at the front of Ms. Coltrain's cell. The two may have had a conversation lasting a few seconds when he left and Ms. Coltrain laid back down again.

80.     On July 20, 2017, Fesser called the Jail and spoke with Holland. Fesser explained she was Kelly's mother. Holland responded: "Good, I can get verification of this. Kelly stated she was drug dependent and had seizures so she needed to go to the hospital." Fesser responded: "Kelly did have seizures." Holland said: "That's another reason to keep her under observation. Kelly had mentioned she might as well die. Kelly said she needed medical care. I explained to her we could take care of her since we have a fine medical facility."[2] Holland told Fesser: "Kelly will be taken good care of." Holland stated: "I have four daughters and I will keep Kelly safe and check on her." Fesser thanked Holland and stated she would be calling the next day.

_____

[2] Holland stated in his Nevada Department of Public Safety - Investigation Division ("NDID") interview that he did "not recall" whether Ms. Coltrain asked to see a doctor.

81. The July 20th video from 1000 to 1820 shows Kelly lying hour after hour in bed, buried beneath blankets, occasionally restless, but invisible under the blankets. At approximately 1200, Kelly appeared to have violent full body convulsions. At 1210 Defendant Holland looked in at Kelly through the cell bars for approximately four seconds then exited. During the next few hours Kelly remained in bed, fully reclined, sometimes restless, occasionally having a sip of water. According to Holland, Kelly refused breakfast and lunch and had very little for dinner.

82. The July 20th video reveals that no medical person came to see Kelly and her vitals were not taken. She is not visited by medical personnel and there are no documents showing incidents, observations, medical care, or medical monitoring.

83. The July 21th video from 0000 to 0120 shows Kelly covered beneath blankets. At 0140, the video shows Kelly stretching, standing up, drinking water, and sitting for a short time.

84. The July 21st video from 0200 to 0920 shows Kelly in a variety of positions in bed, covered beneath blankets. At 0920, Kelly briefly got out of bed, used the toilet, and went back to bed.

85. On the morning of July 21, 2017, Carol Fesser called the Jail again and spoke with Holland. In that call, Fesser provided Holland with the name and number of Kelly's grandmother who would be driving to Hawthorne to retrieve Kelly upon her release. Holland assured Fesser that Kelly would be, and was, "fine."

86. The July 21st video from 0920 until 2340 shows Kelly again in bed, buried beneath blankets. At 1006, a deputy looked into Kelly's cell for eight seconds but there did not appear to be communication as Kelly remained under blankets.

87. At approximately 1218, Holland looked into Kelly's cell with something in his hands. Kelly removed her blankets from her face, looked at him and he exited camera view a few seconds later. A moment later Holland walked by Coltrain's cell but did not stop.

88. From 1220 to 0300, Ms. Coltrain tossed and turned, otherwise there was nominal movement with the blankets covering all but the top of her head. A few hours later, Kelly sat up, had a sip of water, and then returned to bed.

89.     At 1734, Holland was observed looking through the cell for a few seconds. At 1735, Holland returned, handing Kelly a tray of food through the cell door food slot. There was a conversation of approximately ten seconds. Kelly took a few bites of the food, but not much. From 1740 until 1839, Kelly remained in bed covered with blankets where she remained, sometimes prone, sometimes restless, for the remainder of the evening.

90.     The July 21st video reveals that no medical person came to see Ms. Coltrain and her vitals were not taken. She is not visited by medical personnel and there are no documents showing incidents, observations, medical care, or medical monitoring.

91.     The July 22nd video from 0000 to 0419 shows Kelly buried beneath blankets, shifting her position, often in a fetal position. No deputies were observed checking on her. At 0420 and at 0600, Kelly got out of bed, used the toilet and returned to bed.

92.     At or about 0630, Kelly appeared to make heaving-type motions, as if she was vomiting. Vomit was observed flowing into the toilet. She was also observed "heaving" face down, over between the toilet and bed. Afterwards, she lay down again and curled up, moving her positions slightly, a bit restless for the next several hours. At approximately 0918, Kelly appears to have vomited again, on the floor, and made short convulsive type movements every few seconds. No deputies or medical staff came to her cell to question her about her vomit, her health, her convulsions, or her need for medical monitoring.

93.     The July 22nd video from 1300 to 1500 shows Kelly in bed, buried beneath blankets. At 1500, Kelly tossed and turned and again vomited. At approximately 1513, Kelly leaned over the side of the bed and vomited. She appeared to tremble, moving from a fetal position to an extended position. It also appeared that Kelly had short convulsive type movements. At 15:35, Kelly sat on the toilet seat, appearing to tremble. A few moments later she rose off the toilet but remained bent over at the waist, staying in this position for about ten seconds, trembling.[3] She got back in bed and curled into a fetal position, remaining in this position for hours. At approximately 1654, Kelly

---

[3] Holland said in his NDID investigation interview that he had noticed Ms. Coltrain had been "shaking."

14

leaned over and vomited again. She sat up and continued to vomit. She appeared to tremble with the occasional violent twitch.

94.    The July 22nd video at approximately 1711 shows Holland placing a tray of food on the cell door food slot. Kelly sat with the tray, appearing to tremble. Holland remained a few more seconds. Kelly picked at the food but ate little. At 1715, Holland returned to the cell; Ms. Coltrain sat up and continued to tremble and shake. At 1640, Kelly attempted to get out of bed but apparently unable to do so, Kelly vomited directly onto the floor from her bed. She appeared to have short convulsive movements, trembling with the occasional violent twitch.

95.    Kelly had a short limited conversation with Holland, after which Kelly moved up against the wall and sat trembling with her legs pulled towards her chest while covered with the blanket. No deputies or medical persons came to her cell to question her about her vomit, her health, or her need for medical monitoring.[4]

96.    The July 22nd video at 1740, shows Holland opening Kelly's cell door and tossing a new set of black and white jail clothes on the foot of Kelly's bed next to the food tray. Holland pointed with his left hand and gestured towards the area on the floor where Kelly had vomited. Holland left, returning moments later with a mop. Holland spoke briefly to Kelly and she appeared to listen. Holland pointed at Kelly and then at the vomit on the floor. Holland exited the cell while Kelly remained seated looking towards the floor, visibly trembling. A few moments later, Kelly leaned off the bed and grabbed the mop handle, appearing to mop the floor from a seated position on the bed. She mopped the floor for a few seconds then stopped; she appeared to be trembling, then resumed mopping. It appears Kelly was having extreme difficulty completing the task.

97.    Holland returned and pointed again with his index finger towards the areas on the floor Kelly had apparently missed with the mop.[5] Kelly leaned over and tried to mop the floor in the areas Holland had pointed to. Soon after, Holland removed the mop and left the cell.[6]

---

[4] Holland said in his NDI investigation interview that: "He could tell that Coltrain did not feel well, however he was not a "doctor and could not analyze her condition." Holland added that he was aware Ms. Coltrain was not eating her meals.

[5] Holland said in the NDID investigation interview that he wanted the floor to be cleaned and thought Ms. Coltrain was "lazy" because she didn't want to stand up to clean the floor.

98.     The July 22nd video at 1800 shows Kelly in bed beneath blankets. At approximately 1814, an inmate and a deputy walked by Kelly's cell but did not stop. Kelly was in a fetal position.

99.     At 1821, Kelly, fully reclined on her stomach, appeared to have small convulsive spasm type movements a few seconds apart. Kelly's head moved toward the bed mattress until the majority of her face was in the mattress. She appeared to have a series of convulsive, spasm-type movements a few seconds apart which continued for a few minutes. Kelly's final movement appears to occur at approximately 1826 when her right hand fell down and off the bed. Kelly is now dead and does not move from that position again.

100.    On information and belief, deputies discovered Kelly to be deceased in this position at approximately 1230, yet no one came to her cell.[7]

101.    Despite policy requiring twice hourly bed checks, Kelly lay dead, unmoving for at least four hours before any MCJ personnel discovered her.

102.    Various deputies walked by her cell, but neither the video nor the later investigative interviews demonstrate any attempt to administer first aid, try to resuscitate her, or attempt emergency measures.

103.    The July 22nd video reveals that even though Kelly remained in the exact same position for more than five hours, no deputies or medical person came into her cell to offer first aid, attempt resuscitation, or ascertain why she had not moved in hours.

104.    Indeed, the available video shows no one entering Kelly's cell from the time Holland insisted she clean her own vomit, thinking her lazy because she was too weak to perform the task, until approximately 540 the next morning.

---

[6] Holland said in the NDID investigation interview that after the mop incident, as he prepared to go off shift, he told Gulcynski: 'Make sure she's not going to vomit again, and if she does you know, then maybe we should get her over to the hospital." Shortly after the mop incident, Ms. Coltrain was dead.

[7] In the NDID investigation, Holland stated that Gulcynski went into her cell, touched her toe and found it "cold." The video does not show this. The video of this alleged action by Gulcynski is missing.

105.    The July 23rd video continues to show Kelly in the exact same position, from 0000 until 0540, an additional five hours. Kelly remained dead in her cell for more than ten hours while an occasion deputy walked by.

106.    The July 23rd video shows an officer arriving at 0540 with a clip board. Kelly's door is opened and other officers arrive. Two officers begin taking pictures—a blonde female uses a camera and a male officer uses a cell phone camera. Kelly is in exactly the same position she was in at 1826 on July 22nd. A deputy turned Kelly on her back, revealing her abdomen to be blotched a deep red, and more pictures were taken.[8] At approximately 0600, a deputy appeared to check Kelly's level of rigor and then checked for her pulse. At 0620 officers arrive with a black body bag and soon after a gurney. More officers come into the cell, more pictures are taken. By 0640, Kelly is taken away in a body bag.

107.    Kelly was pronounced dead on July 23, 2017 at the MCJ. The cause of death listed on her Certificate of Death was complications of drug use due to probable seizure from drug withdrawal.

108.    In the morning hours of July 23, 2017, Detective Desiree Mattice, from the Nevada Department of Public Safety - Investigation Division ("NDID"), telephoned Carol Fesser to inform her of her daughter's death.

109.    On the morning of July 23, 2017, Deputy M. Boyle informed David Wise, Kelly's uncle, that he was aware Kelly had been "sleeping and vomiting" continuously in her cell. Deputy Boyle informed Mr. Wise that Kelly was not a "medical care" case and admitted she was not receiving "medical attention."

**Findings of Nevada Department of Public Safety Investigation Division**

110.    NDID Investigator Damon Earl ("Earl") completed an investigation into Kelly's death on April 26, 2018.

---

[8] It appears Hypostasis had occurred, which is the accumulation of fluid or blood in the lower parts of the body or organs under the influence of gravity as occurs in cases of poor circulation or after death. The red blotches appear on Ms. Coltrain's neck and face as she was face down and dead for more than ten hours.

111.     Earl concluded Kelly had disclosed her drug dependency and history of seizures related to drug use. During the course of her incarceration she told Gulcynski she wanted medical intervention. Staff was also aware that over a period of time she was vomiting and exhibiting withdrawal symptoms. The investigation revealed that regular welfare checks did not occur. Earl concluded, "Based upon investigative findings it appears that several Mineral County Detention Facility policies and procedures were violated. These policy violations may also constitute statutory violations, specifically: "NRS 197.200 Oppression Under Color of Office, Subsections 1(d) and 2d (b) and NRS 212.020 Inhumanity to Prisoners, Subsection 1(a). Earl's investigation was submitted for "prosecutorial review concerning any potential criminal culpability by involved staff."

112.     Earl noted Kelly was not taken to the hospital as required by policy and the hospital is directly east of the MCJ, requiring a "little over two minutes" to transport her.

113.     Earl noted the placing of an inmate in a security cell must include an incident report and protective custody watch sheet including the circumstances surrounding the security cell placement, notification, and observations taken. Earl noted that the 15-30 minute watches with a "physical check" were not performed. Documents relating to any observations were not made.

114.     Earl noted, pursuant to the video, there were very limited times where Kelly had actual contact with any staff. Had more contact been made, indicators of Kelly's medical condition may have been observed. Earl noted, "These indicators may have alerted staff therefore prompting medical attention to be rendered to Coltrain."

115.     Earl noted that both Gulcynski and Holland were aware Kelly refused meals, and vomited repeatedly but failed to document any "observations" taken.

116.     Earl noted that Gulcynski discovered Kelly unresponsive yet did not render aid or contact EMTs. Earl noted MCJ had no policy on what to do with an unresponsive inmate. Earl also noted that based on his training and experience that medically trained personnel who respond to unresponsive or deceased individuals, at the very least, put the patient on some type of electronic heart monitor to determine whether or not there are signs of activity.

**FIRST CLAIM FOR RELIEF**
**(Deliberate Indifference to Serious Medical Needs Against Holland, Gulcynski and Does 1-10)**
**42 U.S.C. Section 1983- Violation of the 14th Amendment**

117.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

118.    Defendants violated Kelly Coltrain's Fourteenth Amendment right to medical care.

119.    Defendants knew that Kelly Coltrain faced a serious medical need. Drug withdrawal has long been recognized by correctional institutions as constituting a serious medical need requiring appropriate medical care.

120.    Defendants knew withdrawal is a serious and potentially deadly medical condition, with symptoms including seizures, hallucinations, agitation, vomiting, and increased blood pressure.

121.    Defendants knew that drug withdrawal in an inmate, coupled with a history of drug withdrawal seizures, requires urgent medical attention.

122.    Defendants knew that Kelly Coltrain was drug dependent, going into withdrawal, and had a history of withdrawal related seizures.

123.    Defendants knew that Kelly Coltrain, at intake, and at other times during her incarceration, requested to go to the hospital and to receive medical care because of her high risk for withdrawal related seizures.

124.    Defendants knew Kelly Coltrain had lain for days at the Jail, in bed, buried beneath blankets, vomiting multiple times, refusing meals, trembling, shaking, and rarely moving. Defendants knew Kelly Coltrain was in medical distress.

125.    Defendants at all times had access to the video of Kelly Coltrain in her cell and at all times knew she was buried beneath blankets, had vomited multiple times, refused meals, appeared to be trembling or shaking, and had rarely moved.

126.    Defendants knew Kelly Coltrain had not moved her position in her cell from 1820 until 2340 on July 22nd for more than five hours. Defendants knew Kelly Coltrain had not moved her position from 0000 until 0540 on July 23rd for more than five hours.

127.    Defendants knew Kelly Coltrain lay dead in her cell for more than ten hours before jail staff came into her cell. Defendants have no policy or procedure on what to do with an unresponsive inmate and no first aid or emergency measures were taken to save Ms. Coltrain's life.

128.    Kelly Coltrain never received any medical care whatsoever while at the MCJ. No medical staff appeared at her cell, monitored or documented her condition, or took her vital signs.

129.    Holland, Gulcynski, and Does 1-10 seriously aggravated Kelly Coltrain's medical condition by failing to monitor her medical condition and take her to the hospital. Defendants Holland and Gulcynski were the moving force in causing Kelly Coltrain's death.

130.    Holland, Gulcynski, and Does 1-10 seriously aggravated Kelly Coltrain's medical condition by denying her medical and refusing her request to be taken to the hospital.

131.    Holland, Gulcynski, and Does 1-10 were deliberately indifferent to Kelly Coltrain's serious medical need, which caused her death.

132.    Kelly Coltrain's medical condition was treatable and her death preventable. If Ms. Coltrain had received timely and appropriate medical care, she would not have died. Kelly Coltrain suffered a protracted, extensive, painful, unnecessary death as a result of defendants' failures.

133.    As an indication of the deliberate indifference and reckless disregard for the health and safety of Kelly Coltrain, Holland, Gulcynski and Does 1-10 ignored Kelly's clear medical distress dismissing it as laziness when she appeared too weak to clean her own vomit, refusing to provide medical attention when she specifically requested it, failing to observe the several seizures Kelly appeared to suffer, leaving her alone in her cell for at least four hours before even noticing that she had died, and, upon discovering her unresponsive, failing to attempt first aid or provide emergency measures to resuscitate her.

134.    Kelly Coltrain had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to her known serious medical needs.

135.    Holland, Gulcynski, and Does 1-10 knew or should have known of this clearly established right at the time of Ms. Coltrain's death. The contours of the right required only that reasonable measures to mitigate and/or eliminate the substantial risk to Kelly Coltrain be taken.

136.    Holland, Gulcynski, and Does 1-10 acted under the direction and supervision of Defendant Sheriff Adams who set forth the standards, policies and procedures on treatment of inmates.

137.    Pursuant to the policies and procedures set by Adams, Kelly Coltrain was not seen by a medical doctor at any time despite: 1) knowledge from Kelly that she was drug dependent with a history of drug withdrawal seizures; 2) knowledge from Kelly that she wanted to go to a hospital and obtain medical care; 3) confirmation from Kelly's mother, Carol Fesser, made directly to Holland, that Kelly Coltrain had a history of withdrawal related seizures; 4) statements made by Holland, to Carol Fesser, that Kelly Coltrain requested to go to the hospital and receive medical care; and 5) confirmation from Gulcynski that Kelly requested medical care and he refused it.

138.    Holland, Gulcynski, and Does 1-10 made intentional decisions with respect to the conditions under which the Kelly Coltrain was confined. Those conditions put Kelly Coltrain at substantial risk of suffering serious harm. The Defendants failed to take reasonable available measures to abate the risk, even though reasonable officials in the circumstances would have appreciated the high risk of harm. The consequences of the Defendants' conduct are obvious: by refusing and denying medical care, Defendants caused Kelly Coltrain's death.

139.    By violating procedures, protocols, practices, and actions on the proper care of inmates who are detoxifying and placed in a Max Cell, with regard to cell checks, observation by trained medical staff, medical monitoring, incident reports, and requests for medical attention, Defendants Holland, Gulcynski and Does 1-10 were deliberately indifferent to Kelly Coltrain's serious medical need.

140.    Defendants Holland, Gulcynski, and Does 1-10 had actual knowledge, both subjective and objective, of Ms. Coltrain's serious medical need and deliberately ignored it. Holland, Gulcynski and Does 1-10 were objectively unreasonable in failing to provide for Kelly Coltrain any medical care whatsoever and violating MCJ policies and procedures regarding requests for medical attention, incident reports, cell checks, and possible responsive measures to an unresponsive inmate. Reasonable officers would have known that ignoring serious signs of medical distress would violate a detainee's constitutional rights. Reasonable officers would have known that

1  the denial of and failure to take Ms. Coltrain to a hospital for appropriate  medical care when on

2  notice of her high risk of drug withdrawal related seizures, is objectively unreasonable.

3      141.    As a direct and proximate result of Defendants' conduct, Kelly Coltrain experienced

4  physical pain, severe emotional distress, and mental anguish for days, and died.

5      142.    The conduct alleged herein caused Kelly Coltrain to be deprived of her civil rights

6  that are protected under the United States Constitution. This conduct legally, proximately,

7  foreseeably, and actually caused Kelly Coltrain to die and to suffer extreme physical and emotional

8  distress before her death. This conduct was the moving force in the death of Kelly Coltrain.

9      143.    The conduct alleged herein was done in deliberate or reckless disregard of Kelly

10  Coltrain's constitutionally protected rights; justifying the award of punitive damages against the

11  individual defendants.

12  **SECOND CAUSE OF ACTION**
**(Failure to Properly Train)**

13  **As Against County of Mineral, Adams, Holland and Supervisory Does 1-10**
**42 U.S.C. Section 1983- Violation of the 14th Amendment**

14

15      144.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same

16  herein by this reference.

17      145.    Mineral County and Adams had no policy with regard to care of inmates

18  withdrawing from drug dependency.

19      146.    Mineral County and Adams had inadequate policies or training regarding medical

20  care for inmates, such that the policy allowed Defendants Holland, Gulcynski, and Does 1-10 to

21  deny Kelly any medical care without fear of repercussion.

22      147.    Mineral County, Adams, Holland and the supervisory Doe Defendants violated

23  existing policies requiring transport to medical facilities, cell checks, incident reports and

24  documentation of observations of inmates withdrawing from drug dependency with a history of

25  seizures.

26      148.    Mineral County and Adams may be held liable for their policy of inaction when such

27  inaction amounts to a failure to protect constitutional rights. A policy is a deliberate choice to

28  follow a course of action made from among various alternatives by the official or officials

22

responsible for establishing final policy with respect to the subject matter in question. The policy of inaction used by Sheriff Adams and the MCJ was an official policy and the decision to adopt that particular course of inaction by the government's authorized decisionmaker amounts to a policy. Such an official policy evidenced a deliberate indifference to the serious medical needs of inmates suffering from drug withdrawal.

149.    Mineral County and Adam's policy of failing to provide medical care for inmates withdrawing from drug dependency with high risk of seizures and failing to train deputies in how to care for, monitor, and recognize such inmates with a high risk of harm amounts to deliberate indifference to the constitutional rights of such inmates. The failure to train deputies in recognizing when a person in their custody is in need of medical assistance for a serious medical need amounts to deliberate indifference.

150.    Mineral County and Adams's policy of failing to provide medical care for inmates withdrawing from drug dependency with high risk of seizures and failing to train deputies in how to care for, monitor, and recognize inmates with a high risk of harm due to drug withdrawal and associated seizures amounts was the moving force behind the constitutional violation and caused the death of Kelly Coltrain.

151.    Mineral County and Adams have a policy and practice of failing to train deputies to provide adequate medical care to inmates at the MCJ. The lack of training is a result of Mineral County and Adams deliberate indifference to the serious medical needs of persons withdrawing from drug dependence at the Jail.

152.    Mineral County and Adams have a policy and practice of failing to train deputies on the serious risk of harm and death associated with ignoring the serious medical needs of inmates and how to reliably and safely monitor inmates as they detoxify.

153.    Mineral County and Adams have a policy and practice of failing to train deputies to recognize the obvious signs of medical distress from inmates withdrawing from drug dependency with high risk of seizures.

154.   Mineral County and Adams have a policy and practice of failing to train deputies to take meaningful health screenings from inmates who are drug dependent and will be withdrawing from drug dependency with high risk of seizures.

155.   It was reasonably foreseeable that Mineral County and Adam's deficient policies for managing drug detoxification and failure to provide meaningful training to deputies would lead to the pain, suffering, and death of Kelly Coltrain.

156.   Mineral County and Adam's policy and practice of inadequate training to provide meaningful treatment for inmates undergoing drug withdrawal supports a finding of reckless indifference.

157.   Adams, Holland, and Supervisory Does 1-10, with reckless disregard, failed to train deputies on conducting proper cell checks, to observe and document the medical status of inmates placed in a Max Cell to ascertain when inmates withdrawing from drug dependency with high risk of seizures, are near dead and/or dead in their cells.

158.   Defendants Adams, Holland, and Supervisory Does 1-10, failed to train deputies and develop policies on how to timely conduct an initial evaluation to determine if an inmate is at risk for suffering from withdrawal and seizures related to withdrawal.

159.   Defendants Adams, Holland, and Supervisory Does 1-10, failed to train deputies and develop policies to ensure medical staff make the decision on who should be placed in an observation cell and who should be transferred to the hospital to be treated for withdrawal.

160.   Defendants Adams, Holland, and Supervisory Does 1-10, failed to train deputies and develop policies to ensure physicians, physicians assistants, and/or nurse practitioners would be timely involved in assessing and treating inmates potentially undergoing withdrawal and at high risk for drug withdrawal related seizures.

161.   Defendants Adams, Holland, and Supervisory Does 1-10, failed to train deputies and develop policies to ensure the Clinical Institute Withdrawal Association ("CIWA") protocol or the Clinical Opiate Withdrawal Scale ("COWS") or an equivalent validated monitoring protocol will be used to monitor inmates detoxifying.

162.    Defendants Adams, Holland, and Supervisory Does 1-10, failed to train deputies and develop policies to ensure the Clinical Opiate Withdrawal Scale ("COWS") is used to monitor the medical status of inmates detoxifying.

163.    These policies and practices, as well as the failure to train, were deliberately indifferent to the rights of Kelly Coltrain because Mineral County, Adams, Holland, and Mineral County's unknown supervisory staff were aware of a substantial risk of serious harm to inmates withdrawing from drug dependence with a history of seizures.

164.    These constitutionally infirm policies and lack of adequate training caused Kelly Coltrain's death.

165.    As a direct and proximate result of Mineral County, Adams, Holland, and Supervisory Doe Defendants' conduct, Kelly Coltrain experienced physical pain, severe emotional distress, and mental anguish for days, and died in agony.

166.    The conduct alleged herein was done in deliberate or reckless disregard of Kelly Coltrain's constitutionally protected rights; justifying the award of punitive damages against the individually named defendants.

### THIRD CAUSE OF ACTION
**(Failure to Properly Supervise)**
**As Against County of Mineral, Adams, Holland and Supervisory Does 1-10)**
**42 U.S.C. Section 1983- Violation of the 14th Amendment**

167.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

168.    Defendants Mineral County, Adams, Holland and Does 1-10 failed to provide adequate supervision to the staff who are required to render medical care, and/or to alert medical staff that meets the standards of the Constitution.

169.    Defendants Mineral County, Adams, Holland and Does 1-10 failed to provide adequate supervision to officers that hold the power, authority, insignia, equipment entrusted to them.

170.   Defendants Mineral County, Adams, Holland and Does 1-10 failed to promulgate and enforce adequate policies and procedures related to the violation of citizens' civil rights by deputies and medical staff.

171.   Defendants Adams, Holland and Does 1-10 failed to provide promulgate corrective policies and regulations in the face of repeated constitutional violations.

172.   Defendants Adams, Holland and supervisory Does 1-10 failed to follow existing policies regarding cell checks, observation, documentation of incidents, and requests for medical attention.

173.   Defendants Adams, Holland and Does 1-10 set in motion a series of acts by others or knowingly refused to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict a constitutional injury.

174.   Defendants Adams, Holland and Does 1-10 are liable for their own culpable actions and or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that shows a reckless or callous indifference to the rights of others.

175.   A sufficient causal connection exists between the above described supervisory misconduct and the constitutional violations above described.

176.   As a direct and proximate result of Defendants' conduct, Kelly Coltrain experienced physical pain, severe emotional distress, and mental anguish for days, as well as death.

177.   The conduct alleged herein caused Kelly Coltrain to be deprived of her civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably, and actually caused Kelly Coltrain to suffer emotional distress, pain and death.

178.   The conduct alleged herein was done in deliberate or reckless disregard of Kelly Coltrain's constitutionally protected rights; justifying the award of punitive damages against the individually named defendants.

**FOURTH CAUSE OF ACTION**
**(Monell Municipal Liability)**
**As Against County of Mineral**

179.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

180.     Defendant Mineral County made be held liable for acts of omission when such omissions amount to an official policy. Acts of omission, as well as commission, may constitute the predicate for a finding of liability under section 1983.

181.     Defendant Mineral County failed to train employees in a manner that provided for the serious medical needs of inmates. The need for more or different training was obvious and the inadequacy of Mineral County's policies of failing to provide a safe and effective drug withdrawal protocol was obvious. The need to provide medical treatment for inmates with serious medical needs was obvious. Because the combined inadequacy of these failures was highly likely to result in the violation of constitutional rights of inmates with serious medical needs, policymakers in the County can be reasonably said to have been deliberately indifferent.

182.     On information and belief, there were longstanding and systemic deficiencies in the MCJ's treatment to inmates. Deficiencies included improper cell checks, inadequate medical staffing, failure to provided adequate medical screening for inmates with serious medical needs, and lack of diagnosis and treatment of inmates withdrawing from drug dependency, particularly those at high risk for seizures. Also, on information and belief, there existed a longstanding and systemic failure to follow existing policies regarding cell checks, documentation of inmates in Max Cells, documentation of incidents such as vomiting, trembling, and convulsions. Such deficiencies and omissions give rise to a policy or custom of failing to take remedial steps when necessary.

183.     Mineral County's failure and refusal to train its deputies on the treatment of inmates in medical distress gives inference of a municipal custom that authorized or condoned deputy misconduct.

184.     Mineral County had a custom and practice of disbelieving complaints of inmates when such inmates request medical attention for serious medical needs and denying such inmates access to adequate medically appropriate medical care.

185.   Mineral County had a custom and practice of failing to communicate the medical needs of inmates and the visible observation and symptoms of such inmates from deputies to trained medical staff.

186.   Mineral County had a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious physical needs.

187.   Mineral County had a de facto policy of permitting unconstitutional and lawless conduct by its employees.

188.   Mineral County was deliberately indifferent to the right of Kelly Coltrain to be free from, and protected from, the deliberate indifference and misconduct of its employees.

189.   As a direct result of Mineral County Sheriff's Department longstanding custom and practice of deliberate indifference to the serious medical needs of persons withdrawing from drug dependency and its policy of denying and refusing to provide medical treatment for people with serious but treatable medical needs, it was deliberately indifferent to a substantial risk of serious harm to inmates such as Kelly Coltrain.

190.   The unlawful and illegal conduct of Defendant Mineral County, its policies, procedures, customs, and practices, deprived Kelly Coltrain of the rights, privileges and immunities secured to her by the Constitution of the United States.

191.   As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at time of trial.

**FIFTH CAUSE OF ACTION**
**Right of Association – 14th Amendment Due Process**
**As against Holland, Gulcynski, and Does 1-10**

192.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

193.   Holland, Gulcynski, and Does 1-10 deprived Kelly Coltrain of her rights under the United States Constitution to be free from cruel and unusual punishment; denial of medical care; and denial of due process.

194.   The aforementioned acts and or omissions of Defendants in deliberate indifferent to Kelly Coltrain's serious medical needs, health and safety; violating Kelly Coltrain's civil rights; and

Defendants' failure to train, supervise and/or take other measures at the MCJ to prevent the conduct that caused the untimely and wrongful death of Kelly Coltrain, deprived Carol Fesser and James Coltrain of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the Fourteenth Amendment to the United States Constitution.

195. There was no legitimate penological interest in denying access to medical care to an inmate in such obvious medical distress and leaving her unattended, lying face down, and dead in her cell for more than ten hours, ignored by all. Defendants' actions shock the conscience.

196. The deprivation of the rights alleged above has destroyed the Constitutional rights of Kelly Coltrain's parents, Carol Fesser and James Coltrain, to the society and companionship of their daughter which is protected by the substantive due process clause of the Fourteenth Amendment.

197. The conduct alleged herein violated Kelly Coltrain's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer emotional distress, pain and suffering, and further damages according to proof at the time of trial.

## SIXTH CAUSE OF ACTION
### Wrongful Death
### As Against All Individual Defendants

198. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

199. Kelly Coltrain's heirs pursuant to NRS 134.050(3) are: Her father, James Coltrain, and her mother, Carol Fesser.

200. Kelly Coltrain did not bring an action against defendants for damages for the injuries causing her death during her lifetime.

201. Kelly Coltrain's heirs have, by reason of Kelly Coltrain's death and pursuant to NRS 41.085(4) suffered pecuniary loss, and expenses related to the death of Kelly Coltrain.

202. Kelly Coltrain's heirs have, by reason of Kelly Coltrain's death, suffered extraordinary physical and emotional pain in the form of grief and sorrow, loss of probable support, companionship, society, comfort and consortium.

### SEVENTH CAUSE OF ACTION
**Survival Action**
**As Against All Individual Defendants**

203.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

204.    Kelly Coltrain did not bring an action against defendants for damages for the injuries causing her death during her lifetime.

205.    Kelly Coltrain's estate pursuant to NRS 41.085(5) may recover any special damages which Kelly Coltrain incurred or sustained before her death, and funeral expenses. The estate may also pursue any penalties, including but not limited to, exemplary or punitive damages Kelly Coltrain would have recovered if she had lived. The estate is also entitled to the damages Kelly Coltrain could have recovered if she had not died, including pain and suffering and lost earnings.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Issue a judgment declaring that the actions of Defendants described herein are unlawful and violate Plaintiffs' rights under the constitution and laws of the United States;

2.    For general damages in a sum according to proof;

3.    For special damages in a sum according to proof;

4.    For punitive damages in a sum according to proof;

5.    For leave to amend or supplement the Complaint when the identity of the Doe Defendants is discovered and new evidence is uncovered;

6.    For declaratory relief;

7.    For reasonable attorney's fees pursuant to 42 U.S.C. Section 1988;

8.    For cost of suit herein incurred; and,

9.    For such other and further relief as the Court deems just and proper.

DATED:  This 29th day of August, 2018

/s/  Terri Keyser-Cooper
TERRI KEYSER-COOPER
KERRY S. DOYLE
*Attorneys for Plaintiffs*